IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 21, 2000

## CLAUDE FRANCIS GARRETT v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 92-B-961      Seth Norman, Judge**

_____

**No. M1999-00786-CCA-R3-PC - Filed March 22, 2001**


The defendant, after being convicted of first degree murder and sentenced to life imprisonment, was denied post-conviction relief by the Criminal Court of Davidson County.  Defendant now appeals that denial and asserts that (1) the State withheld exculpatory evidence in violation of Brady v. Maryland, thereby undermining the confidence of the outcome of the trial; (2) the trial court erred by unconstitutionally instructing the jury; (3) the defendant was not afforded effective assistance of counsel; and (4) juror misconduct and bias violated the defendant's constitutional rights.  The issue of juror misconduct was addressed by this court on direct appeal and, therefore, is not properly before this court.  After review, we affirm the trial court's finding that the defendant received effective assistance of counsel; however, we reverse and remand the case for a new trial because the prosecution withheld exculpatory evidence in violation of Brady v. Maryland, thereby undermining the confidence in the outcome of the trial.

**Tenn. R. App. P. 3, Appeal as of Right; Judgment of the Criminal Court Reversed and Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Dwight E. Scott, Nashville, Tennessee, for the appellant, Claude Francis Garrett.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General;  Victor S. (Torry) Johnson III, District Attorney General; and John C. Zimmermann, Assistant District Attorney, for the appellee, State of Tennessee.


**OPINION**

**Introduction**

The defendant, Claude Francis Garrett, was tried and convicted of first degree murder and sentenced to life imprisonment.  After direct appeal and denial for permission to appeal to the Tennessee Supreme Court, the defendant petitioned the Criminal Court of Davidson County

for post-conviction relief. The trial court held a post-conviction relief hearing on July 15, 1998. At the conclusion of the hearing the trial judge denied the petition without making any findings of fact or conclusions of law. Defendant then appealed the denial to this Court and this Court remanded the case to the trial court to make findings of fact and conclusions of law. The trial court entered findings of fact and conclusions of law in support of its denial and the defendant now appeals from that denial and his appeal is properly before this court.

## Background Facts

The underlying background facts surrounding this case were summarized by this Court on direct appeal as follows:

> At approximately 5:00 a.m. on February 24, 1992, the victim, Lorie Lance, died from smoke inhalation when a fire engulfed the residence she shared with the defendant. When firefighters arrived, the defendant reported that he had escaped the blaze, but that the victim was still inside. Later, firefighters found the unconscious victim in a <u>locked</u> utility room. A large window in the room had been covered with boards. Efforts to revive the victim failed.
>
> Investigators found traces of kerosene on the living room floor, a kerosene soaked bedspread in front of the refrigerator, and a five gallon plastic container filled with kerosene between the refrigerator and the utility room. A smoke detector from which the battery had been removed was found on the utility room dryer. All of these circumstances suggested that the defendant had <u>locked</u> the victim inside the room and then set the house on fire.
>
> At trial, Sandra Lee Jones, the victim's mother, testified that her twenty-four-year-old daughter was a student at Volunteer State Community College and was an employee of Uno's Pizzeria at the time of her death. Ms. Jones, diagnosed as a manic depressive, had visited her daughter on several occasions and had expressed concern about her daughter's safety because her residence had no back door. The victim had installed a smoke detector in the kitchen to alleviate her mother's fears.
>
> Michael Wayne Alcorn, who lived across the street from the victim and the defendant, testified that he was awakened by his wife on the night of the fire and saw flames extending from the windows, the room, and the front door. Alcorn, who saw the defendant stooping near a tree, stated that he started to cross the road in an effort to help, at which point the defendant picked up a lawn chair, began breaking windows of the residence, and called the victim's name. When Alcorn's son Bobby arrived at the scene, the defendant handed him an axe, and began to spray water through one of the windows. Alcorn noted that the defendant's left hand had been badly burned and that his facial hair had been singed. He described the defendant's emotional state as "sort of cold."

Fireman Patrick Hunt was one of the first to arrive at the scene. He testified that the defendant first informed Hunt that he had last seen the victim just outside the bedroom; when Hunt was unable to find her there, the defendant then said, "I know where she's at, if you'll go straight through the back of the house she's through a back door, the door in the back of the house by the kitchen."

A short time later, Captain Otis Jenkins found the unconscious victim in the utility room wedged between the washer and dryer and the wall. Captain Jenkins testified that the door to the utility room had been locked from the outside.

Immediately after the fire, Detective William Michael Roland had gone to the hospital to interview the defendant. The defendant appeared to be nervous and claimed that he and the victim had been asleep when the fire started. He also claimed that he saw the victim re-enter the residence and walk towards the kitchen. Although he had not yet been accused of setting the fire, the defendant asked if he was under arrest. When Detective Roland asked him to go to the police station for further questioning, a second statement given by the defendant did not match the first but was closely aligned to his trial testimony.

Detective David Miller, who led the investigation, questioned the defendant at the police station, had an officer photograph the defendant's injuries, and took possession of his clothing for testing purposes. Detective Miller testified that the defendant refused to provide a hand swab.

The defendant stayed at the Alcorn home for two days after the fire. During that time, the defendant appeared nervous but not despondent. He informed Bobby Alcorn that the police suspected he had "done it" and had taken his clothes to check for gasoline or kerosene.

When the police decided to place charges, they were unable to find the defendant at the address he supplied. Using information received from an anonymous source, they eventually located the defendant in Hiawatha, Kansas.

Special Agent James Cooper, with the ATF Department of the U.S. Treasury Department, had led efforts to determine the cause of the blaze. He testified that the fire's point of origin was the living room and that a liquid accelerant had been poured on the floor. Agent Cooper determined from the burn pattern that the door to the utility room was closed during the fire.

Agent Sandra Paltorik Evans, a forensic scientist, tested each item collected by the police to determine whether an accelerant was present. She found that the bedspread, the five-gallon container, the smoke detector, and the living room flooring contained a "kerosene-type" distillate. Agent Evans also tested the

smoke detector by inserting a nine-volt battery and applying smoke; she found it to be in proper working order. She testified that the pants and shirt taken from the defendant tested negative for accelerant.

Dr. Mona Gretel Harlan, Assistant Medical Examiner for Davidson County, conducted the autopsy. Dr. Harlan testified that the victim had first and second degree burns over approximately twenty percent of her body and had an accumulation of soot at the opening of her mouth and nose. The "rather pink color" of the victim's blood led Dr. Harlan to conclude that the victim had died from an excessive intake of carbon monoxide. The blood alcohol level of the victim was .06 percent. No traces of narcotics were present. While examining the scene of the fire, Dr. Harlan found that when locked, the door to the room where the body was found could only be opened from the outside.

The defendant, a construction worker who conceded that he had previously been convicted of grand theft, two burglaries, and a jail escape, testified in his own behalf. He stated that he and the victim had been involved in a relationship for one and one-half years and planned to be married. He claimed that on the night of the fire, he and the victim spent several hours at a local bar, where they saw the victim's stepfather and stepbrother. He testified that they returned to their residence, watched television for a time, and fell asleep on the couch for a time before going to bed. The defendant claimed that upon discovering the fire, he got out of bed, walked to the bedroom door, and yelled for the victim. The defendant testified that the victim grabbed his arm but pulled away and turned as if she was going back toward the rear of the house.

The defendant remembered that [Michael] Wayne Alcorn directed Ms. Alcorn to "call the fire department." The defendant claimed that he had called to the victim as he broke out the windows and had instructed Bobby Alcorn to chop the bathroom window when he thought he heard water running. He contended that when firefighters arrived, he immediately informed them that he had last seen the victim in their bedroom. The defendant denied telling one of the firemen that he was a brother to the victim. He explained that when fireman were unable to find the victim on their first try, he had merely suggested the utility room as a possible alternative. He stated that when the victim was finally located, she was taken to a nearby hospital where efforts to revive her failed. The defendant, who had severe burns to his left arm and his face, testified that he sat with the victim's family as they awaited a report on her condition. He claimed that when medical personnel informed the group that the victim had died, he responded, "Why Lorie?"

The defendant testified that he fully complied with all requests made by investigating officers and specifically denied refusing to provide a "hand swab." He provided explanations for some of the statements he had made to firefighters and law enforcement officials. The defendant denied locking the victim in the utility room and pointed out that Captain Jenkins was incorrect about there being

-4-

a second lock and a door knob on that door. He believed that the door was not locked, but merely hard to open. The defendant testified that kerosene located beside the refrigerator and beside the kerosene heater in the living room were routinely kept there as a matter of convenience. He explained that he had spilled some kerosene while filling the heater on two or three different occasions. The defendant testified that he had purchased the smoke detector found on the dryer as a Christmas present for his mother and stepfather; his mother had returned the gift after noticing a strong kerosene smell at the defendant's residence. The defendant claimed the smoke detector was inoperable because the victim kept forgetting to buy batteries. He stated that the detector had been taken down a few days before while the kitchen was being painted.

The defendant believed that his neighbor, Stacy Floyd, might have started the fire by throwing a "molotov cocktail." He testified that the victim told him she had stolen eighty dollars and some marijuana from Ms. Floyd's mobile home on the day of the fire. The defendant acknowledged that he and the victim smoked some of the marijuana later that evening. He suggested that the girlfriend of the victim's uncle was a possible suspect in the crime. The defendant admitted that he had "beaten" the victim on three prior occasions.

When asked why he "ran off" to Kansas after being questioned about the fire, the defendant claimed that he had gone there to stay with his mother. He testified that several people knew how to reach him there, including his aunt, whose telephone number he had given to the police.

Fireman William McCormick testified for the defense. He stated that he and Captain Corbin had to restrain the defendant from re-entering the house. When he asked the defendant about his relationship to the person trapped inside, he claimed that the defendant said that he was her brother. McCormick noted that the defendant smelled of alcohol and appeared to be "slightly intoxicated."

Captain Corbin confirmed that he had to help McCormick restrain the defendant. He testified that the defendant, who appeared to be intoxicated, began beating on the door of the fire truck and frantically telling firemen that the victim was in the bedroom.

Henry Lance, the victim's grandfather, testified that he had known the defendant for about a year and that the two had worked together. He had observed the defendant and victim together on numerous occasions and believed that they "got along all right."

Sylvia Hall, wife of the victim's cousin, testified that the defendant and the victim had lived with her and her husband for approximately two months before renting

their own home. She said that the victim and the defendant argued, like "normal couples" do, but never engaged in a physical confrontation. She did, however, admit that the victim once claimed to have received bruises during a fight with the defendant.

The defendant's aunt, Gladys Adkins, testified that the defendant stayed at her home for about a week after his house burned. She stated that she transported him back to the hospital to get the burns on his face, forehead, nose, hand, and arm redressed. At the end of his stay, she and her daughter drove the defendant to the bus station so that he could travel to Kansas to stay with his mother.

Betty Satterfield, the defendant's mother, corroborated the defendant's claim about the smoke detector. She recalled having observed that the defendant stored extra kerosene inside the house. Ms. Satterfield claimed that, after the fire, she called her sister-in-law and asked her to send the defendant out to Kansas so she could take care of him.

Connie Matthews, a waitress at the bar the defendant and victim visited on the evening of the fire, confirmed that the two were there until about 2:00 a.m. She testified that the victim and the defendant had not fought during the course of the evening but had noticed that the victim seemed to be fearful of the defendant. Sometime after the fire, the defendant stopped at the bar and told Ms. Matthews that he did not kill the victim. She said he also showed her a pistol and told her that it was for "anybody who wanted to mess with him."

The state called Stacy Floyd to testify in rebuttal. She testified that she and her roommate had a party on the night of the fire. Because it was a warm night and she had no air conditioning, Ms. Floyd had left her door open and, therefore, remembered the defendant and victim returning to their residence at approximately 3:00 a.m. Ms. Floyd, who thought about inviting them to join her party, decided not to because it was raining. Ms. Floyd empathically denied that she had started the fire, as the defendant theorized, and denied having a motive to do so.

Tina Harris, the victim's supervisor at Uno's Pizzeria for approximately a year and a half, also testified in rebuttal. Ms. Harris, who described the victim as friendly and very "happy-go-lucky," remembered her coming to work once with a black eye and marks on her leg and lower back.

On surrebutal, the defendant reiterated that he had never struck the victim. He also contended there was not a party at Ms. Floyd's trailer when he and the victim came home on the night of the fire. He denied that it was raining that evening.

State v. Garrett, No. 01C01-9403-CR-00081, 1996 WL 38105, at *1-5 (Tenn. Crim. App. Feb. 1), perm. app. denied, (Tenn. July 8, 1996) (emphasis added).

-6-

**Analysis**

The defendant asserts four issues for review in this appeal: (1) juror misconduct and bias violated the defendant's constitutional rights; (2) the defendant was not afforded effective assistance of counsel; (3) the trial court erred by unconstitutionally instructing the jury; and (4) the State withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), thereby undermining the confidence in the outcome of the trial.

**I. Jury Misconduct**

The defendant contends that juror misconduct and bias resulted in a violation of the defendant's constitutional rights. Specifically, the defendant claims that juror Stephanie Huffman untruthfully answered questions in voir dire regarding family members being fire and police officers. Defendant also claims that Ms. Huffman made comments in jury deliberations referring to the integrity of her cousins in California that were fire and police officers.

Although the defendant appears to raise colorable allegations of constitutional violations, the trial court heard the matter and denied the defendant a new trial. Further, this Court affirmed that decision on direct appeal stating:

> [T]he defendant claims that he should have been granted a new trial because Ms. Huffman, a juror, was dishonest in voir dire when she denied that any members of her family were in law enforcement. He argues that, but for her untruthful answer, she would not have been seated as a juror because of her potential bias toward the state. He further insists that statements the juror made during deliberations show that she had an actual bias against the defendant, thus depriving him of a fair trial.
>
> The common law rules governing challenges to juror qualifications fall into two categories: (1) propter defectum or (2) propter infectum. Partin v. Henderson, 686 S.W.2d 587, 589 (Tenn. Ct. App. 1984). Objections based upon general disqualifications, such as alienage, family relationship, or statutory mandate, are within the proper defectum class and, as such, must be made before the return of a jury verdict. Literally translated, proper defectum means "on account of defect." State v. Akins, 867 S.W.2d 350, 355 (Tenn. Crim. App. 1993).
>
> In contrast, a propter affectum challenge, translated as "on account of prejudice," is based upon the existence of bias, prejudice, or partiality towards one party in the litigation "actually shown to exist or presumed to exist from circumstances." Durham v. State, 182 Tenn. 577, 588, 188 S.W.2d 555, 559 (1945); see also Toombs v. State, 197 Tenn. 229, 270 S.W.2d 649 (1954). Propter affectum challenges may be made after the return of the jury verdict. State v. Furlough,

797 S.W.2d 631, 652 (Tenn. Crim. App. 1990). A juror who conceals or misrepresents information tending to indicate any lack of impartiality may be challenged upon motion for new trial. The burden is on the defendant to show that the juror had an actual bias or prejudice. State v. Caughron, 855 S.W.2d 526, 539 (Tenn.), cert. denied, 510 U.S. 979, 114 S.Ct. 475 (1993).

At the hearing on the defendant's motion for a new trial, juror Nicholson testified that he believed Ms. Huffman had been untruthful in voir dire by failing to answer affirmatively that she had relatives in law enforcement. According to Nicholson, Ms. Huffman related to fellow jurors during deliberations that she had relatives who worked in both the fire and police departments in California and that she believed people holding those types of positions were heroes who would not "compromise a crime scene" or make a mistake during a "search and rescue." Nicholson stated that he then asked her why she failed to mention this connection in voir dire; he claimed she did not respond.

Ms. Huffman also testified at the hearing and denied having any law enforcement officers in her immediate family. She conceded that a third cousin worked as a firefighter in California. Ms. Huffman further stated that she had mentioned her cousin during jury deliberations, but denied saying that members of her family worked for the Police or the Sheriff's Department.

The trial court found that Ms. Huffman had not been dishonest in answering the questions propounded to her during voir dire. It ruled that Ms. Huffman was asked only whether she had family members who were law enforcement personnel, a category which does not encompass firefighters, and that her answers were truthful. The trial court concluded that the circumstances had not prejudiced the defendant's right to a fair trial. Findings of fact made by the trial court are given the weight of a jury verdict. See State v. Burgin, 668 S.W.2d 668 (Tenn. Crim. App. 1984). The trial court chose to credit the testimony of Ms. Huffman; it acted within its prerogative in doing so. We cannot reverse the holding unless the evidence preponderates against the conclusion reached by the trial court. It does not in this instance.

State v. Garrett, No. 01C01-9403-CR-00081, 1996 WL 38105, at *8-9 (Tenn. Crim. App. Feb. 1), perm. app. denied, (Tenn. July 8, 1996).

The trial court granted the defendant a hearing on this matter and denied the defendant any relief, which was upheld on direct appeal. See Garrett, 1996 WL 38105, at *8-9. An appellant may not, by way of a post-conviction proceeding, relitigate questions decided and disposed of on direct appeal. Harvey v. State, 749 S.W.2d 478 (Tenn. Crim. App. 1987); Searles v. State, 582 S.W.2d 389 (Tenn. Crim. App. 1976); see Tenn. Code Ann. § 40-30-206(h).

Therefore, this claim, having already been litigated and disposed of on direct appeal, is not properly before this Court.

## II. Ineffective Assistance of Counsel

Defendant next alleges that he received ineffective assistance of counsel at trial. Defendant claims the following instances of ineffective assistance of counsel: (1) failure to interview prosecution witnesses; (2) failure to make an adequate record of violations of sequestration of witnesses; and (3) failure to request Jenks Act material. Defendant also argues that the cumulative effect of various other omissions amounted to prejudice sufficient to undermine confidence in the result of the trial.

Post-conviction defendants bear the burden of proving their allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f). On appeal, the appellate court accords the trial court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997); Bates v. State, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).

The Sixth Amendment to the United States Constitution and Article I, section 9 of the Tennessee Constitution both require that a defendant in a criminal case receive effective assistance of counsel. Baxter v. Rose, 523 S.W.2d 930 (Tenn. 1975). When a defendant claims constitutionally ineffective assistance of counsel, the standard applied by the courts of Tennessee is "whether the advice given or the service rendered by the attorney is within the range of competence demanded by attorneys on criminal cases." Summerlin v. State, 607 S.W.2d 495, 496 (Tenn. Crim. App. 1980).

In Strickland v. Washington, the United States Supreme Court outlined the requirements necessary to demonstrate a violation of the Sixth Amendment right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). First, the defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and must demonstrate that counsel made errors so serious that he was not functioning as "counsel" guaranteed by the Constitution. Strickland, 466 U.S. at 687, 104 S. Ct. at 2064. Second, the defendant must show that counsel's performance prejudiced him and that errors were so serious as to deprive the defendant of a fair trial, calling into question the reliability of the outcome. Id.; Henley, 960 S.W.2d at 579.

"When addressing an attorney's performance it is not our function to 'second guess' tactical and strategic choices pertaining to defense matters or to measure a defense attorney's representation by '20-20 hindsight.'" Henley, 960 S.W.2d at 579 (quoting Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)). Rather, a court reviewing counsel's performance should "eliminate the distorting effects of hindsight . . . [and] evaluate the conduct from the perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation."

Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996). On the other hand, "deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." Goad, 938 S.W.2d at 369.

To establish prejudice, a party claiming ineffective assistance of counsel must show a "'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694, 104 S.Ct. at 2068.).

In reviewing a claim of ineffective assistance of counsel, an appellate court need not address both prongs of Strickland if it determines that the defendant has failed to carry his burden with respect to either prong. Henley, 960 S.W.2d at 580. When the claim is predicated upon counsel's failure to present potential witnesses, their testimony should be offered at the post-conviction hearing. In this manner the court can consider (1) whether a material witness existed and could have been discovered but for counsel's neglect or a known witness was not interviewed by counsel; and (2) whether the failure to discover or interview a witness prejudiced the defendant or the failure to call certain witnesses denied critical evidence to the prejudice of the defendant. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

The defendant first asserts that his trial counsel did not interview two key witnesses, specifically Fire Captain Otis Jenkins and Detective David Miller. However, at the post-conviction relief hearing the defendant's trial counsel testified that he spoke with Detective Miller over the phone and Detective Miller told him that the door was unlocked. This information from Miller did not contradict what the District Attorney had told trial counsel; that he had no information that the door was locked. Trial counsel made adequate effort to contact the detective and did in fact speak with him.

Defendant's trial counsel did not, however, speak with Captain Otis Jenkins. Trial counsel testified at the post-conviction relief hearing that he repeatedly phoned and attempted to contact various fire fighters, including Captain Jenkins. Trial counsel also testified that he left messages for these individuals to return his calls. Furthermore, trial counsel consulted with the defendant about which witnesses to contact and subpoena. We find that trial counsel made an adequate attempt to contact the prosecution witnesses and agree with the trial court's conclusion that this was not ineffective assistance of counsel.

Next, the defendant asserts that trial counsel failed to make an adequate record of violations of the sequestration of witnesses. Although this violation may have been an important event in the underlying trial that caused potential problems, trial counsel testified that he did not know at that point in the trial whether the violations were serious enough to ask for a mistrial. The defendant should have called, at the post-conviction hearing, the alleged witnesses who were part of the violation to substantiate the potential prejudice of the violations to allow the post conviction court to determine whether a mistrial would have been proper. The defendant did not call such witnesses.

We do note that in the direct appeal this Court relied on trial counsel's inactions in holding that there was insufficient information in the record to determine whether the trial court erred in its handling of the sequestration violations. We stated, "We must presume . . . that the trial court acted appropriately. Moreover, the defendant did not request that the trial court take curative measures, nor did he voice any objection to the manner in which the court handled the matter. That constitutes a waiver of the issue." State v. Garrett, No. 01C01-9403-CR-00081, 1996 WL 38105, at *8 (Tenn. Crim. App. Feb. 1), perm. app. denied, (Tenn. July 8, 1996) (citations omitted).

Although we previously placed significant weight on the fact that the defendant waived this issue, our reliance alone does not deem that inaction by trial counsel constitutionally ineffective assistance of counsel. In fact, issues are waived through the course of many criminal trials and seldom do they give rise to a successful ineffective assistance claim. While it is obvious that the post-conviction court neglected to make findings of fact and conclusions of law on this issue, after a complete review of the record and the transcript, we do not think that trial counsel's waiver of this issue amounted to ineffective assistance of counsel causing prejudice that undermined the confidence in the outcome of the trial.

Next, the defendant claims that trial counsel's failure to request Jencks material on three different occasions amounted to ineffective assistance of counsel. The three witnesses that the defendant claims trial counsel was unable to effectively cross-examine because of his failure to request Jencks material were Fireman Hunt, Captain Otis Jenkins, and Detective David Miller.

Tennessee Rule of Criminal Procedure 26.2, commonly known as the Jencks Act, provides for, upon motion of the party that did not call the witness, production of any statements made by that witness relating to the subject matter of their testimony. The moving party is entitled to such statement only after the witness has testified on direct examination. Tenn. R. Crim. P. 26.2. As this court has previously held in State v. Robinson, 618 S.W.2d 754, 760 (Tenn. Crim. App. 1981), this provision applies to reports made by officers during the course of an investigation. In the event the non-moving party claims that the material contains matter not relating to the subject matter testified to by the witness, "the court shall order that it be delivered to the court in camera . . . [and] the court shall excise portions of the statement that do not relate to the subject matter concerning which the witness has testified." Tenn. R. Crim. P 26.2(c).

Although trial counsel could have requested Fireman Hunt's report that he filed after the fire, the defendant did not present any evidence at the post-conviction hearing on how the failure to request this report prejudiced the outcome of the trial. Defendant also failed to show how this report could have been used to effectively cross-examine Fireman Hunt. Therefore, there is no evidence that this failure undermined the confidence in the outcome of the trial nor rendered the defendant's assistance of counsel ineffective.

A more plausible argument has been made for the failure to request Detective David Miller's report. This report, which the prosecution never produced, contained detailed

information about Miller's investigation and revealed that Captain Jenkins reportedly found the door to the utility room <u>unlocked</u>. Regarding cross-examination of Detective Miller, however, there is no evidence how the report could have been used effectively against him. If defense counsel would have possessed the report, the report could possibly have been used by calling Miller as a rebuttal witness to potentially impeach Captain Jenkins' testimony at trial that the door to the utility room was locked. However, the most damaging portion of the report that would have been used for impeachment, Jenkins' statement, most likely would have been excised from the report in the event the prosecution objected to its production because it was not Detective Miller's statement. <u>See, e.g.</u>, <u>State v. Jones</u>, 1989 WL 1123 (Tenn. Crim. App. filed Jan 11, 1989, at Nashville); <u>see also</u> <u>Robinson</u>, 618 S.W.2d 754. Although the post-conviction court failed to make findings of fact and conclusions of law on this issue also, after reviewing the record, we find that this failure did not undermine the confidence in the outcome of the trial and did not render counsel's assistance ineffective.

The defendant's assertion that trial counsel's failure to request Jencks material from Captain Jenkins constituted ineffective assistance of counsel is misplaced. In Tennessee Rule of Criminal Procedure 26.2(g), a statement for purposes of Jencks material means:

> (1) A written statement made by the witness that is signed or otherwise adopted or approved by the witness; or (2) A substantially verbatim recital of an oral statement made by the witness that is recorded contemporaneously with the making of the oral statement and that is contained in a stenographic, mechanical, electrical, or other recording or a transcription thereof.

The defendant has submitted no such evidence that any Jencks material existed pertaining to Captain Jenkins. Defendant only asserts that he could have impeached Captain Jenkins on his prior inconsistent statement. Although this assertion is correct, the material that would have been used to impeach Jenkins would not have come from a Jencks request of Jenkins; the material would have come from Miller's report. The defendant has not shown that there were any statements that trial counsel could have received upon a Jencks request after Jenkins' direct testimony. Therefore, we find that counsel was not ineffective for this failure.

The defendant's final assertion of ineffective assistance of counsel is based on the fact that trial counsel failed to cross-examine the State's witnesses regarding the omission of a kerosene soaked bedspread in front of the refrigerator on the diagrams of the crime scene. The prosecutor listed a bedspread on the evidence log; however, by looking at crime scene diagrams trial counsel had no knowledge of the location of such evidence at the crime scene. This bedspread was not included on a sketch of the crime scene made by crime scene Fire Investigator Kenneth Porter, Jr. nor others who made crime scene sketches. In fact, this piece of evidence was found by prosecution investigator West after the fire investigators concluded their investigations and prepared their reports.

This discrepancy most likely did not appear as significant until the defendant discovered the letter from the Metro Police Department's homicide division pointing out that the bedspread needed to be added to the diagrams to avoid any questions of the crime scene, which is one of the

bases of the defendant's <u>Brady</u> violation claim. In hindsight, perhaps trial counsel should have cross-examined the State's witnesses on the omission of this crucial piece of evidence when they began to testify about finding it at the crime scene. However, we cannot merely speculate as to what trial counsel should have and would have asked, given the lack of knowledge of the homicide department's letter. Although the post-conviction court neglected to make findings of fact and conclusions of law on this issue also, after review of the post-conviction petition and hearing, we find that the defendant did not present sufficient evidence that trial counsel rendered ineffective assistance of counsel when he failed to cross-examine the State's witnesses regarding the omission of a kerosene soaked bedspread in front of the refrigerator on the diagrams of the crime scene.

After review of the record and considering the unique situation that trial counsel was placed after receiving information from the prosecutor that was contradicted by the State's witnesses, we hold that the cumulative effect of trial counsel's errors does not rise to the level of constitutionally ineffective assistance of counsel.

### III. Moral Certainty/Mind Rest Easily Jury Instructions

The defendant next asserts that the trial judge incorrectly instructed the jury. Initially, we again note the post-conviction court's omission of findings of fact and conclusions of law pertaining to this and other issues even after remand with instructions to do so. Therefore, we will again take it upon ourselves to review the entire record before us to make such findings and conclusions.

The defendant specifically contends that the jury instruction given by the trial judge lowered the burden of proof by which the State had to prove him guilty of every element of the offense. Defendant points to the following instruction on reasonable doubt as being erroneous:

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case, and an inability, after such an investigation, to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean a capricious, possible, or imaginary doubt. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required as to every proposition of proof requisite to constitute the offense.

The defendant points to one Federal District Court case, <u>Rickman v. Dutton</u>, 864 F. Supp. 686 (M.D. Tenn. 1994), in support of his contention that the trial court incorrectly instructed the jury. In <u>Rickman</u>, the Federal District Court for the Middle District of Tennessee held that the "moral certainty language in conjunction with the mind rest easily language suggests to a reasonable juror a lower burden of proof than what is constitutionally required." <u>Rickman</u>, 864 F. Supp. at 707. However, as this Court recently pointed out, "the Sixth Circuit has cast grave doubt on the viability of the district court's ruling in <u>Rickman</u> by upholding the constitutionally of the reasonable doubt/moral certainty instruction given at a Tennessee death-row inmate's trial in

Austin v. Bell, 126 F.3d 843, 846-47 (6th Cir. 1997), cert. denied, ___ U.S. ___, 18 S. Ct. 1526, 1547, 140 L. Ed. 2d 677 (1998)." Williams v. State, No. 01Co1-9709-CR-00441, 1998 WL 748689, at *1 (Tenn. Crim. App. 1998). Furthermore, the Tennessee Supreme Court has repeatedly upheld the constitutionally of substantially identical jury instructions as the ones the defendant contends are erroneous. See, e.g., State v. Bush, 942 S.W.2d 489, 520-21 (Tenn. 1997); State v. Nichols, 877 S.W.2d 722, 734 (Tenn. 1994). In light of the foregoing precedent, we hold that the trial court's jury instructions pertaining to moral certainty in this case are also constitutional.

## IV. Brady Violation

The defendant claims that his constitutional rights were violated when the prosecution withheld exculpatory evidence that was material, which undermined the confidence in the outcome of the trial. Defendant points to three different items that he received after the conclusion of his direct appeal as the basis of his claim. These items include: (1) an eleven-page report from Detective David Miller, which contains a summary of Miller's conversations with Fire Captain Otis Jenkins indicating that the door to the utility room where the victim was found was not locked (Miller Report); (2) a toxicology report that indicated the defendant had a blood alcohol level of .11 after the fire (Toxicology Report); and (3) a diagram of the fire scene attached to a letter from the homicide department instructing the Fire Marshall's office to make several changes and additions to the fire department's depiction of the fire scene in order to avoid any questions about discrepancies before placing a diagram in the homicide file (Homicide Letter).[1]

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and the "Law of the Land" Clause of Article I, section 8 of the Tennessee Constitution affords all criminal defendants the right to a fair trial. The United States Supreme Court, in Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of good faith or bad faith of the prosecution." See also Hartman v. State, 896 S.W.2d 94, 101-02 (Tenn. 1995). The duty to disclose extends to all "favorable information" regardless of whether the evidence is admissible at trial. State v. Marshall, 845 S.W.2d 228, 232-33 (Tenn. Crim. App. 1992); Branch v. State, 469 S.W.2d 533, 534-36 (Tenn. Crim. App. 1969). Exculpatory evidence includes information or statements of witnesses which are favorable to the accused and evidence in which the defense may use to impeach a witness. See State v. Walker, 910 S.W.2d 381, 389 (Tenn. 1995); State v. Copeland, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998); Irick v. State, 973 S.W.2d 643, 657 (Tenn. Crim. App. 1998); see also United States v. Bagley, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380, 87 L. Ed. 2d 481 (1985); McDowell v. Dixon, 858 F.2d 945 (4th Cir. 1988), cert. denied, 489 U.S. 1033, 109 S. Ct. 1172, 103 L. Ed. 2d 104 (1972).

---

[1] Although Appellant does not extensively address this letter and diagram in his brief, Appellant did assert the importance of these in his petition and addressed them at the post-conviction hearing. Therefore, upon our review of the entire record on appeal, we will also address their importance.

The Tennessee Supreme Court has held on several occasions that in order to establish a Brady violation, the defendant must show the existence of four elements: (1) that the defendant requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not); (2) that the State withheld the information; (3) that the withheld information was favorable; and (4) that the withheld information was material. See Erskine Leroy Johnson v. State, No. W1997-00024-SC-R11-PD (Tenn., filed January 19, 2001, at Jackson); Walker, 910 S.W.2d at 389; State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995).

While there is some confusion about whether the toxicology report was disclosed, we do not find that the State withheld that particular information nor do we believe that the defendant could have used this information to convince the jury to make a different guilt determination. After all, the defendant presented information to the jury of his intoxication. We do, however, find some problems with the letter sent by the homicide department to the Fire Marshall's office instructing the Fire Marshall's office to alter their fire scene diagram. Although the discoverable nature of this letter and attached diagram are questionable, the defendant potentially could have used this material in preparing an effective cross examination of any of the investigators, firemen, or officers that responded to or investigated the scene. However, we do not believe that suppression of this information alone undermined the confidence of the verdict. See, e.g., Irwick, 973 S.W.2d 643.

We are most troubled with the eleven-page Miller Report, which was not disclosed to the defendant. The State contends that this report was neither withheld, exculpatory, nor material. We disagree in all respects. The evidence in the post-conviction hearing showed that the prosecutor led defense counsel to believe that the State had no information about the locked or unlocked status of the utility room door. However, at trial the State's witnesses testified that the utility room door was locked and the prosecutor submitted to the jury as the theory of the State's case that the defendant locked the victim in the utility room and set the house on fire. Therefore, the State did have, prior to trial, information that the door was locked. In fact, not only did the State have information that the door to the utility room was locked, but they also possessed the eleven-page Miller Report, which indicated otherwise: that Fire Captain Jenkins, who was the first to enter the utility room and find the victim's body, found the door unlocked.

This eleven-page report was clearly withheld from the defendant. However, the State, in its brief, claims that because Officer Miller informed defense counsel that the door was unlocked then this information was not withheld. The State's assertion that the defendant was aware that the State had no information that the door was locked is undermined by the State relying so heavily at trial on testimony that the door was locked. Assistant District Attorney General Zimmerman, when questioned at the post conviction hearing as to why he did not include the eleven-page report in discovery, stated, "I felt like Detective Miller's recollection was vague, he could not specifically remember the conversation he had with Captain Jenkins, and all he knew is what he had recorded in his report, which was equivocal, at best, and Jenkins was absolutely clear on it." This Court is extremely troubled with General Zimmerman's decision to himself

determine the reliability of the evidence and to refuse to turn over evidence he believes is unreliable, especially when the evidence is requested and is exculpatory.

Essentially, the State intentionally withheld the information by leading the defendant to believe they had no information about the status of the door and then pursuing the very opposite theory at trial: that the defendant had locked the victim in the utility room and set the house on fire. We agree with the defendant that the information was withheld.

The State next contends that the information was not exculpatory. This report was clearly exculpatory given the State's theory of the case. The State painted a picture of the defendant locking the victim in the utility room and then pouring kerosene on the floor and setting the house on fire in order to kill the victim. The information in the report clearly indicated that when Captain Jenkins found the victim he remembered the door to the utility room being <u>unlocked</u>. In fact, Captain Jenkins is the one person that would have the most reliable information about the status of the door because he was the one who entered the utility room and found the victim. This report was clearly impeachment material that the defendant could have used to undermine the State's entire theory. On direct appeal of this case, prior to the defendant's knowledge of the eleven-page report, Judge Wade stated:

> The defendant next claims that the trial court improperly refused to grant a mistrial despite the state's failure to disclose, in advance of trial, the fact that Captain Jenkins had found that the utility room door <u>was locked</u>. He claims that this failure to disclose denied him <u>Brady</u> material. The state's response is that the defendant was not entitled to the evidence under <u>Brady</u> because it was inculpatory rather than exculpatory and was not impeachment evidence. . . . <u>That the victim was found in a room which had been locked from the outside was damaging to the defendant's case. Had the door not been locked, one of the defendant's hypothesis, that the victim went in the utility room and shut the door in an attempt to escape the fire, might have been viable.</u> With the door being locked from the outside, however, the logical inference was that the defendant had locked the victim in the utility room, set the house on fire, and left the victim to die. In our view, the evidence was not exculpatory. The defendant also argues that he was entitled to this information because he could have used it to impeach Captain Jenkins. He has failed, however, to explain his basis for this assertion. Captain Jenkins had not previously made any written or oral statement. We are, therefore, unable to see how this statement that the utility room door was locked could have been used for impeachment.

<u>Garrett</u>, 1996 WL 38105, at *6-7 (emphasis added). The record reveals that Officer Miller's report, which Officer Miller contends is correct, contained an oral statement by Captain Jenkins that supported what Judge Wade classified as a "viable defense." <u>Id.</u> at *6.

When viewed in light of the State's theory, we believe the withheld eleven-page police report is clearly favorable to the defendant. As Judge Wade noted in the direct appeal, such a contradictory statement would tend to corroborate the accused's potentially viable defense.

Moreover, Zimmerman's own testimony at the post-conviction hearing supports the exculpatory nature of the report. Zimmerman testified as follows:

Q. Is the report from Detective Miller, the 11-page report, that has already been put into evidence in this case, indicating the conversation between Detective Miller and Fire Captain Otis Jenkins, in your file?

A. Oh, yes.

Q. Had you –

A. And I asked Captain Jenkins specifically about that statement when I interviewed him.

Q. When you interviewed him? When?

A. Before the trial?

Q. Before this hearing or before the trial?

A. No. Before the trial. And I asked him about that and he denied ever making it. He said, "I didn't say that". And his memory was extremely clear, because he's the one who unlatched the door.

Q. So you had read this report before trial?

A. Absolutely. And knew about it and confronted Mr. Jenkins. I said, "This is what Detective Miller said". He said, "Well he's wrong, I never said that".

Q. Did you – what was your opinion regarding this information? Did you consider it to be exculpatory information?

A. No, I didn't. I knew that – I knew that Detective Miller had interviewed a lot of witnesses in this case, and sometimes detectives get things wrong. It's not unusual for a detective to misunderstand a witness, and that's why I specifically asked Captain Jenkins.

I don't know that I showed Captain Jenkins the words that Captain Miller put in his report, but I told him, I said, "Well" – and I told him that Detective Miller said that the best he could remember, and so forth. And he said, "No. I never told him that. He asked if he was locked and he said, 'Yes'". And how detective Miller got it, I don't know.

Q.      So – but it was your – it was your opinion in the preparation of this trial that this information was not exculpatory information, that the defense had no right to it; is that what you're saying?

A.      Well, all I'm saying is this, that what Detective Miller thought he heard was incorrect. Detective Miller still, to this day, doesn't recall the conversation, he just recalls what he put down in the report. But when you ask Detective Miller about it, the only recollection he's written in his report, but he doesn't recall the conversation. That's – that's the problem you deal with in this kind of thing.

Q.      Did you not consider this to be sort of like having one of your material witnesses misidentified, or in some way misidentified the defendant?

A.      Well, again, let me say this, when the – when a police officer records something that a witness tells him, you always confront the witness first: "Did you say this to the police officer? This is what they wrote down." "No. I didn't say it"; or, "Yes. I said this:; or, "This is what I mean"; or, "He only got part of it." Particularly on a description, because sometimes descriptions are a collection of many different witnesses and what they say.

        I felt like Detective Miller's recollection was vague, he could not specifically remember the conversation he had with Captain Jenkins, and all he knew is what he had recorded in his report, which was equivocal, at best, and Jenkins was absolutely clear on it.

The unavailability of this report, when viewed in light of the State's theory of the case and Judge Wade's classification of such unavailable statement in the direct appeal, combined with General Zimmerman's own testimony in the post-conviction hearing, clearly evinces the exculpatory nature of the unavailable statement. Furthermore, the statement could have been introduced by calling Miller to the stand to testify about Jenkins' prior inconsistent statement, thus impeaching Jenkins' testimony. Accordingly, we conclude that the defendant has successfully established the third element needed to assert a constitutional violation under Brady.

        The final step in analyzing this Brady claim is whether the failure of the State to disclose the eleven-page Miller Report was material in determining guilt.

        Whether the information in this case is material to proving guilt is somewhat complex given the nature of the crime charged, murder in the perpetration of a felony: to wit arson. If this were a premeditated and intentional first degree murder, there is no question that the information that the door was unlocked would have been material. Any evidence that the defendant locked the victim in the room prior to setting the fire would be very material in proving premeditation and intent to kill under Tennessee Code Annotated section 39-13-202(a)(1). However, to convict a person for felony murder, "[n]o culpable mental state is required for conviction under

-18-

subdivision (a)(2) . . . except the intent to commit the enumerated offenses or acts in such subdivisions." Tenn. Code Ann. § 39-13-202(b). Therefore, the State must prove that the defendant intentionally caused an arson and someone died in the perpetration of that arson. We take judicial notice of this court's opinion in the direct appeal that the defendant was convicted of murder in the perpetration of a felony: to wit arson.

The nature of felony murder calls into question the materiality of whether the door to the utility room was locked or unlocked. If the jury determined that the defendant intentionally committed an arson and someone died as a result of the arson then the defendant would be guilty of felony murder. Such an analysis might normally lead one to conclude that because this was a conviction for felony murder, then the information about the status of the door was immaterial because the State only has to show intent to commit the arson, not intent to kill. However, in this case, and as noted by this Court on direct appeal, the crux of the State's theory was that the defendant locked the victim in the room and set the house on fire, and left the victim to die. The State relied heavily on the fact the utility room door was locked, apparently to show intent to commit the arson and the door being locked was damaging to the defendant's case. By heavily relying on this piece on information and painting such a picture before the jury, the State clearly established the materiality of the status of the door.

The Tennessee Supreme Court has established that evidence is material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Edgin, 902 S.W.2d at 390 (adopting the United States Supreme Court's materiality standard set out in Kyles v. Whitley, 514 U.S. 419, 435 n.8 (1995)). Despite the use of the word "probability" in our state's cases, "the test of materiality is not whether the defendant would more likely than not have received a different verdict had the evidence been disclosed. Nor is the test of materiality equivalent to that of evidentiary sufficiency, such that we may affirm a conviction . . . when, 'after discounting the inculpatory evidence, the remaining evidence is sufficient to support the jury's conclusions.'" Johnson, No. W1997-00024-SC-R11-PD, at *6 (quoting and citing Strickler v. Green, 527 U.S. 263, 275 (1999)). Essentially, "evidence is material when, because of its absence, the defendant failed to receive a fair trial, 'understood as a trial resulting in a verdict worthy of confidence.'" Id. at *7 (quoting Kyles, 514 U.S. at 434).

Here, the State asserts that "[i]n light of the significant evidence presented at trial of the defendant's guilt, . . . any error on the part of the State by failing to produce the police report resulted in no prejudice to the defendant." The State pursued the same theory in Erskine Leroy Johnson v. State, No. W1997-00024-SC-R11-PD (Tenn., filed January 19, 2001, at Jackson). The Johnson court pointed out that a Brady inquiry is not akin to a sufficiency of the evidence question and stated that "a reviewing court must determine whether the defendant has shown that 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict.'" Id. at *7 (quoting Irwick, 973 S.W.2d at 657). The Supreme Court discounted the State's argument in Johnson that even if the prosecutor had turned over an exculpatory report and the defendant could have rebutted some of the facts going to prove an enhancing factor, the jury still could have found the presence of the enhancing factor from the remaining evidence. Id. at *11. We reject the State's same argument here as well. In

essence, the Supreme Court found, as we do here, that the State established the materiality of certain evidence via its particular theory of the case.  See id. at *8.

After our review of the record on appeal, we, as our Supreme Court did in Johnson, find that the withheld police report can reasonably be taken to place this case in such a different light as to undermine our confidence in the verdict, even though sufficient evidence may have otherwise existed to prove the existence of intent to commit the underlying arson.  As in Johnson and Kyles, the "likely damage" from the suppression of the eleven-page report is best understood by considering the State's theory of the case: that the defendant locked the victim in the utility room and set the house on fire.  By the State relying so heavily on this theory combined with the withheld report that would have shown otherwise,  we are not confident that every member of the jury would have still discounted the defendant's theory and come to the same conclusion. Therefore, we hold that withheld police report is material within the meaning of Brady and its progeny.  Because the State withheld exculpatory information which was material to the showing of guilt, and because the withholding of that information undermines our confidence in the outcome of the trial, we hold that the State committed such a Brady violation as to require a new trial.

## V.  Inadequate Jury Instructions

In reviewing the record before us, specifically the portion of jury instructions in the record, we are troubled with the fact that the jury was not instructed on the elements of the underlying felony, arson.  The portion of jury instructions in the record read as follows:

FIRST DEGREE MURDER

Any person who commits first degree murder is guilty of a felony.  For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following elements:

(1)     that the defendant unlawfully killed the alleged victim; and

(2)     that the killing was committed in the perpetration of or the attempt to perpetrate the alleged arson; that is that the killing was closely connected to the alleged arson and was not a separate, distinct and independent event; and

(3)     that the defendant intended to commit the alleged arson; and

(4)     that the killing was the result of a reckless act by the defendant.

The court went on to define "reckless" and "intentionally" and instructed the jury on the lesser included offense of second degree murder.  It is apparent from the included jury instructions that the jury was never charged on the elements of the underlying felony offense of arson.  When read as a whole, the instructions seem inadequate to convict a defendant for felony murder and serve to

reinforce the materiality of whether the door was locked. Not only do these inadequate instructions give rise to the materiality issue, they also call into question whether the instructions were so inadequate as to be plain error.

Although appellate courts of this state do not normally consider issues that are not raised at the trial court, "plain error is a proper consideration for an appellate court whether properly assigned or not." State v. Ogle, 666 S.W.2d 58, 60 (Tenn. 1984). Rule 3 of the Tennessee Rules of Appellate Procedure embodies the common law practice that challenge to a particular jury instruction is deemed waived unless the instruction contains plain error. See State v. Cravens, 764 S.W.2d 754, 756-57 (Tenn. 1989); Davis v. State, 793 S.W.2d 650, 651 (Tenn. Crim. App. 1990). Rule 52(b) of the Tennessee Rules of Criminal Procedure states that plain error is an error affecting "the substantial rights of the accused," and may be noticed at any time "where necessary to do substantial justice." A substantial right is proof of every element of the offense and is one that is constitutional in nature. See State v. Hassell, No. 02-C-01-9202CR00038, 1992 WL 386311 (Tenn. Crim. App. 1992).

This Court is also authorized, according to Tennessee Rule of Appellate Procedure 13(b), to consider issues not properly presented for review "(1) to prevent needless litigation, (2) to prevent injury to the interests of the public, and (3) to prevent prejudice to the judicial process." A conviction for a crime which the jury was not instructed would clearly violate an accused's constitutional rights. A conviction for felony murder as a result of an arson would require a jury first finding all of the elements of an arson present. However, according to the jury instructions in the record, the jury was apparently placed in the position of assuming an arson occurred without considering the elements of an arson.

Because a defendant has a right to be proven guilty of each and every element of an offense, to be convicted of felony murder a defendant has a right to be proven guilty of every element of the underlying felony offense to felony murder. If the jury in this case was never instructed on those elements of the underlying offense then it is impossible for the defendant to be convicted of felony murder. Such a conviction would clearly violate a defendant's constitutional and substantial rights and to allow such a conviction would significantly prejudice our judicial process.

Because of our finding that the defendant rights were violated by the State's withholding of Brady material and thus the defendant must have a new trial, we base our reversal solely on those grounds. Because of that decision, in the interest of judicial economy, we choose not to expend our efforts on reviewing the record on direct appeal to determine whether the copy of jury instructions contained in the record before is a complete depiction of the entire jury instructions. If the instructions before us are complete and accurate, we would hold that they are inadequate to support a conviction for murder in the perpetration of a felony: to wit arson. Otherwise, we limit the basis of our reversal to the Brady violation.

**Conclusion**

After review of the entire record before us, we hold that the State violated the defendant's constitutional rights by withholding exculpatory and material information, which undermines our confidence in the outcome of the trial. Because of this violation, we reverse the trial court and grant the defendant a new trial.

_____
JOHN EVERETT WILLIAMS, JUDGE